1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CHRISTOPHER ISAAC SIMMONS,

11              Petitioner,                 No. CIV S-02-0794 RRB JFM P

12      vs.

13   ANTHONY LAMARQUE, Warden,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding in propria persona with an application for

17   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1998 conviction

18   on seven counts of first degree burglary, the unlawful taking of a motor vehicle, and possession

19   of cocaine.  Three prior serious felony convictions were also found true.  Petitioner was

20   sentenced to 175 years to life in prison on January 8, 1999.  Petitioner raises six claims in the

21   second amended petition, filed September 28, 2004, that his prison sentence violates the

22   Constitution.

23                          PROCEDURAL HISTORY

24            1.  Petitioner was convicted on December 4, 1998.

25            2.  Petitioner filed a timely appeal to the California Court of Appeal, Third

26   Appellate District, raising claims of insufficient evidence to support his burglary convictions and

that his sentence constituted cruel and unusual punishment.  (Answer, Ex. A.)  Petitioner's

conviction was affirmed on August 22, 2000.  (Answer, Ex. D, No. C031577.)  Petitioner filed a

timely Petition for Review in the California Supreme Court on September 14, 2000.  (Answer,

Ex. E.)  The California Supreme Court denied the petition on October 25, 2000, without

comment.  (Answer, Ex. F.)

    3.  On May 10, 2001, petitioner filed a petition for writ of habeas corpus in the

Sacramento County Superior Court raising ineffective assistance of trial counsel at pretrial and

trial, denial of the motion to suppress evidence discovered at petitioner's home, and ineffective

assistance of appellate counsel.  (Answer, Ex. G, No. 01F03783.)  On June 8, 2001, the

Sacramento County Superior Court denied the petition on the merits and included citations to In

re Swain, 34 Cal.2d 300 (1949), and In re Harris, 5 Cal.4th 813 (1993).  (Answer, Ex. H.)

    4.  On September 21, 2001, petitioner filed a petition for writ of habeas corpus in

the California Court of Appeal, Third Appellate District.  (Answer, Ex. I, No. C039346.)

Petitioner raised the following claims:  ineffective assistance of trial counsel at pretrial and trial,

denial of the motion to suppress evidence discovered at petitioner's home, and ineffective

assistance of appellate counsel.  (Answer, Ex. I.)  That petition for writ of habeas corpus was

denied, without comment, on October 25, 2001.  (Answer, Ex. J.)

    5.  On June 7, 2001, petitioner filed a petition for writ of habeas corpus in the

California Supreme Court.  (Answer, Ex. K, No. S098156.)  Petitioner raised the following

grounds for relief:  "Denial of access to courts by custodial agency and trial court erred in

dismissing petitioner's civil action while in custody and in pro per under § 581(d) for

abandonment on motion of the defense; severe sanctions for prejudiced default."  (Answer, Ex. K

at 3.)  That petition was denied without comment on November 28, 2001.  (Answer, Ex. L.)

    6.  On November 20, 2001, petitioner filed a second petition for writ of habeas

corpus in the California Supreme Court.  (Answer, Ex. M, No. S102230.)  Petitioner raised the

following claims:  ineffective assistance of trial counsel at pretrial and trial, and denial of the

motion to suppress evidence discovered at petitioner's home.  (Id.)  That petition for writ of habeas corpus was denied, without comment, on November 22, 2001.  (Answer, Ex. N.)

7.  On December 23, 2002, petitioner filed a third petition for writ of habeas corpus in the California Supreme Court.  (Answer, Ex. O, No. S112330.)  In that petition, petitioner raised, for the first time, a claim that at trial, the jury was not presented his psychiatric history of mental disease, defects or illnesses to establish that he was unable to form the requisite mens rea necessary to convict a person of the crime of burglary.  (Id.)  On July 30, 2003, the California Supreme Court denied the petition for writ of habeas corpus, citing In re Clark (1993) 5 Cal.4th 750.)  (Answer, Ex. P.)

8.  On November 7, 2003, petitioner filed a fourth petition for writ of habeas corpus in the California Supreme Court.  (Answer, Ex. Q, No. S120372.)  In this petition, petitioner raised, for the first time, the claim that he was denied a fair trial and his right to a unanimous jury verdict because the jury was instructed with CALJIC No. 17.41.1.  (Answer, Ex. Q.)  This petition was denied by the California Supreme Court on September 1, 2004, with a citation to In re Clark (1993) 5 Cal.4th 750) and In re Robbins (1998) 18 Cal.4th 770, 780.  (Answer, Ex. R.)

9.  On September 28, 2004, petitioner filed the second amended petition in the instant action raising three claims of ineffective assistance of trial counsel, one claim of ineffective assistance of appellate counsel, a claim based on insufficient evidence to support the burglary convictions and the claim alleging jury instruction error (CALJIC No. 17.41.1).  [Docket No. 19.]

10.  On December 13, 2004, respondent filed its answer.  Respondent contends claims five and six are barred by the doctrine of procedural default.

/////

/////

/////

FACTS[1]

Between June and December 1995, seven burglaries were committed in Sacramento.  All but one of the victims went to bed at night after having secured the house, and awoke to discover an open sliding door or window and small items missing from their home.[2]

The morning of June 9, 1995, Kelly Avilla discovered her house had been burglarized during the night.  A video camera, a cashbox with $300, and a purse with credit cards and identification were missing.  Also in the cashbox was a $5 check from a co-worker.  The morning of September 10, 1995, Sherrie Shorey awoke to find both her and her sister's purses were missing.  inside Sherrie's purse were various pieces of identification, credit cards and a dental reminder card.  Her sister's purse also had credit cards, identification and a photo of her nephew.  Five days later, Glenda San ford discovered that her purse, containing credit cards and $700-800 in cash, as well as a unique charm bracelet, were missing.  The morning of November 21, 1995, Bette Young realized her purse containing her credit cards and wallet was gone.  Also in her purse were the keys to the company car, a gold Ford Tempo.  Eight days later, on November 29, 1995, the Ford Tempo was stolen.[3]  Also on November 29, 1995, Una Williams discovered a jewelry box and some of her jewelry missing.  On December 23, 1995, Maria MacNamee discovered her purse and some wrapped Christmas presents were missing.  On Christmas Day, Pamela Gallant also awoke to find her purse, a CD player, jewelry, rare coins, and her husband's jewelry box and wallet were missing.

While on patrol shortly after midnight on December 30, 1995, Officer Kevin Griffin saw [petitioner] driving a gold Ford Tempo.  He ran the license plate number and learned the car had been reported stolen.  Officer Griffin stopped [petitioner], the sole occupant of the car, and took him into custody.  A pat-down search of [petitioner] revealed a rock of cocaine and a rock cocaine pipe.  The gold Ford Tempo was Bette Young's stolen company car.

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Simmons, No. 96F00053 (August 22, 2000), a copy of which is attached as Exhibit D to Respondent's Answer, filed December 13, 2004.

[2]  Una Williams was the only victim who did not learn of the burglary upon arising.  She received a phone call at work from one of her children that morning and confirmed the burglary that afternoon.

[3]  The burglary of Young's apartment is the sole burglary conviction which [petitioner] did] not challenge on appeal.

1          Around this same time, Sheriff's Detective Stephen Hughes was
2  investigating a unique burglary series.  The series of burglaries was
   unique in Hughes's experience, because it involved nighttime
3  occupied "cat burglaries," with only small portable items being
   stolen.  Because [petitioner] was arrested driving Young's car,
4  Hughes was called about [petitioner's] arrest.  Hughes interviewed
   [petitioner], and obtained his consent to search his mobile home
5  and an adjoining shed.

6          In the course of the search, Hughes recovered, among other
   items, Kelly Avilla's cashbox, including the $5 check, and her
7  purse; Sherrie Shorey's purse, still containing the dental reminder
   card and wallet; Shorey's sister's purse with her nephew's picture,
8  a Supercuts card and a friend's business card still inside; Glenda
   Sanford's purse and wallet; Bette Young's tennis racket, purse and
9  wallet; Una Williams's jewelry and jewelry box; Maria
   MacNamee's purse with her work identification badge, Kaiser
10 insurance card and resident alien card; and Pamela Gallant's
   foreign coins.  He also found a ticket which led to the recovery of
11 Sanford's charm bracelet.  [Petitioner] had pawned this item the
   day after the burglary of Sanford's home.

12         [Petitioner] offered no explanation for his possession of the
   stolen car, jewelry, coins, tennis racket, cashbox or charm bracelet.
13 He did, however, present evidence that he was known to collect
   "many things," including stamps and coins, and was a frequent
14 visitor to flea markets and auctions.  [Petitioner's] mother testified
   that some of the items in her son's trailer and shed, including a
15 number of purses, belonged to her and her daughter.  However, she
   admitted that none of the items or purses seized by the police
16 belonged to either her or her daughter.  [Petitioner] also presented
   evidence that, as a result of a back injury, he was physically unable
17 to commit the type of burglaries with which he was charged.

18 (People v. Simmons, slip op. at 2-5.)

19                              ANALYSIS

20 I.  Standards for a Writ of Habeas Corpus

21         Federal habeas corpus relief is not available for any claim decided on the merits in

22 state court proceedings unless the state court's adjudication of the claim:

23         (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal law, as
24         determined by the Supreme Court of the United States; or

25 /////

26 /////

1    (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
2    State court proceeding.

3  28 U.S.C. § 2254(d).

4          Under section 2254(d)(1), a state court decision is "contrary to" clearly

5  established United States Supreme Court precedents if it applies a rule that contradicts the

6  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

8  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

9  (2000)).

10         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

11  habeas court may grant the writ if the state court identifies the correct governing legal principle

12  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

13  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

14  simply because that court concludes in its independent judgment that the relevant state-court

15  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

17  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

18  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

19         The court looks to the last reasoned state court decision as the basis for the state

20  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002); Robinson v. Ignacio, 360

21  F.3d 1044, 1055 (9th Cir. 2004).  Where the state court reaches a decision on the merits but

22  provides no reasoning to support its conclusion, a federal habeas court independently reviews the

23  record to determine whether habeas corpus relief is available under section 2254(d).  Himes v.

24  Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.

25  2000).  When it is clear that a state court has not reached the merits of a petitioner's claim, or has

26  denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a

1  federal habeas court must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th

2  Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

3  II.  Petitioner's Claims

4      A.  Procedural Default

5          When a state prisoner fails to exhaust his federal claims in state court and the state

6  court would now find the claims barred under applicable state rules, the exhaustion requirement

7  is satisfied, but the federal claims are procedurally barred.  Coleman v. Thompson, 501 U.S. 722,

8  735 n.1 (1991); Casey v. Moore, 386 F.3d 896, 920 (9th Cir. 2004).  Similarly, if a federal

9  constitutional claim is expressly rejected by a state court on the basis of a state procedural rule

10 that is independent of the federal question and adequate to support the judgment, the claim is

11 procedurally defaulted.  Coleman, 501 U.S. at 729-30; Bennett v. Mueller, 322 F.3d 573, 580

12 (9th Cir. 2003).  Habeas review of procedurally defaulted claims is barred unless the petitioner

13 demonstrates cause for the procedural default and actual prejudice, or that the failure to consider

14 the claims will result in a miscarriage of justice.  Coleman, 501 U.S. at 750.  Although the

15 question of procedural default "should ordinarily be considered first," a reviewing court need not

16 do so "invariably," especially when it turns on difficult questions of state law.  Lambrix v.

17 Singletary, 520 U.S. 518, 524-25 (1997).  See also Busby v. Dretke, 359 F.3d 708, 720 (5th Cir.

18 2004).  In this case, this court finds that petitioner's jury instruction claim can be resolved more

19 easily by addressing it on the merits.  Accordingly, this court will assume that petitioner's claim

20 is not procedurally defaulted and will address it on the merits.

21      B.  Claims One - Three

22          Petitioner's first three claims are that he suffered ineffective assistance of trial

23 counsel.  Petitioner did not raise these claims on direct appeal.  Petitioner raised ineffective

24 assistance of counsel claims in his May 10, 2001 petition for writ of habeas corpus filed in the

25 Sacramento County Superior Court.  (Answer, Ex. G.)  The Superior Court rejected those claims

26 as follows:

Petitioner first claims that his attorney at the preliminary hearing in the second filing of the case, on October 15, 1996, had completely abandoned any investigation or research into the case, and failed to present evidence, resulting in petitioner's being held to answer.  Petitioner, however, fails to set forth what evidence or law could have been discovered by reasonably competent counsel that could have been presented and made a difference at the preliminary hearing.  The claim, therefore, fails for failure to state with particularity the facts upon which the petitioner is relying to justify relief (In re Swain (1949) 34 Cal.3d 300), supported by reasonably available documentary evidence or affidavits (In re Harris (1993) 5 Cal.4th 813, 827 fn. 5).

Petitioner next claims that his attorney at the time criminal proceedings were reinstated, after he had been found incompetent to stand trial, failed to conduct an independent investigation into petitioner's psychiatric history for purposes of the motion the attorney had made for a second preliminary hearing in the second filing of the case.  Again, petitioner fails to set forth what evidence could have been discovered by reasonably competent counsel that could have been presented and made a difference in the decision not to order a second preliminary hearing, requiring denial under Swain and Harris, supra.

Petitioner makes other claims about the competency of his various counsel.  He again fails to set forth what could have been done differently by reasonably competent counsel that could have made a difference, requiring denial under Swain and Harris, supra.

Petitioner addresses the search and seizure motion with regard to the consent to search and its presentation by counsel.  However, petitioner fails to note that that particular motion was made only in the first filing of this case; after the case was dismissed and refiled, no similar motion was made.  Petitioner does not claim that trial counsel in the second filing of his case was ineffective in not bringing a similar motion.  Even if petitioner were claiming this, the claim would be meritless because petitioner presents nothing in his attachments that would have warranted a decision different from the finding of Judge Tochterman in the first filing, that petitioner was mentally competent to sign the consent to search and did so knowingly, intelligently, and voluntarily.  Judge Tochterman had considered evidence of petitioner's mental condition, and determined that petitioner suffered from depression but that that did not affect capacity at that time.  Even had petitioner made the proper ineffective assistance claim in this petition his claim fails.

. . .

Petitioner also attacks the denial of the Marsden motion or motions as being erroneous.  This claim is barred, as it could have been, but was not, raised on appeal.  (In re Dixon (1953) 41 Cal.2d

8

756, reaffirmed in In re Harris (1993) 5 Cal.4th 813, 829).  The
only exceptions to this procedural bar are:  (1) if the claim is based
on constitutional error that is both clear and fundamental, and that
strikes at the heart of the trial process; (2) if the claim is now
couched in ineffective assistance of counsel terms; (3) if the court
lacked fundamental jurisdiction over the petitioner or the subject
matter; (4) if the court acted in excess of its jurisdiction and the
issue is strictly a legal one not requiring a redetermination of the
facts underlying the crime; or (5) there has been a change in the
law affecting the petitioner (Harris, supra), 5 Cal.4th 813, 834, 834
fn. 8, 836, 840-841, 841; In re Antazo (1970) 3 Cal.3d 100, 108
[exceptions to Dixon rule are same as those to Waltreus rule]).
Petitioner does not show that this claim qualifies for any of these
exceptions.

(In re Simmons, No. 01F03783 (June 8, 2001)(appended to Resp.'s Answer as Ex. H).)  The

subsequent reviewing courts denied these claims without comment.

The Sixth Amendment guarantees the effective assistance of counsel.  The United

States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

counsel, a petitioner must first show that, considering all the circumstances, counsel's

performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

identifies the acts or omissions that are alleged not to have been the result of reasonable

professional judgment, the court must determine whether, in light of all the circumstances, the

identified acts or omissions were outside the wide range of professionally competent assistance.

Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that

he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice

is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S.

at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

determine whether counsel's performance was deficient before examining the prejudice suffered

by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an

1  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

2  followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

3  697).

4          Under California law, a criminal defendant is allowed to introduce evidence of the

5  existence of a mental disease, defect, or disorder as a way of showing that he did not have the

6  specific intent for the crime.  California Penal Code § 28(a) provides:

7          Evidence of mental disease, mental defect, or mental disorder shall
           not be admitted to show or negate the capacity to form any mental
8          state, including, but not limited to, purpose, intent, knowledge,
           premeditation, deliberation, or malice aforethought, with which the
9          accused committed the act. Evidence of mental disease, mental
           defect, or mental disorder is admissible solely on the issue of
10         whether or not the accused actually formed a required specific
           intent, premeditated, deliberated, or harbored malice aforethought,
11         when a specific intent crime is charged.

12  Id.

13              i.  Failure of Pretrial Counsel (Ground One)

14          Petitioner contends attorney Butler failed to have petitioner examined by a

15  psychologist or psychiatrist at any time; did not present any documentary evidence; did not call

16  on expert testimony or other witnesses aware of petitioner's mental state leading up to the arrest;

17  did not investigate thoroughly petitioner's psychiatric history dating back to 1987, where he was

18  involuntarily medicated pursuant to Kehyea v. Rushen,[4] or any of the other records indicating,

19  despite current medications, petitioner was preoccupied and withdrawn, responding to internal

20  stimuli.  (2nd Am. Pet. at 7.)  Petitioner argues that had pretrial counsel taken these actions, there

21  is a reasonable probability that the result of the preliminary hearing would have been different in

22  that the motion to suppress would have been granted.  (Id. at 9-10.)  Petitioner also contends that

23  defense counsel Butler breached attorney/client privilege.  (Id. at 5, 9.)

24  _____

25      [4]  In Keyhea v. Rushen, 178 Cal.App.3d 526, 223 Cal.Rptr. 746 (Cal.App.1986), the state
    appellate court "upheld a consent decree affirming the right of state prisoners to refuse
    antipsychotic medications except under certain limited circumstances."  In re Qawi, 32 Cal.4th 1,
26  21, 7 Cal.Rptr.3d 780, 81 P.3d 224 (Cal.2004).

                                    10

> If there is more than one plausible line of defense, . . . counsel should ideally investigate each line substantially before making a strategic choice about which lines to rely on at trial. If counsel conducts such substantial investigations, the strategic choices made as a result "will seldom if ever" be found wanting. Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment. [Citation omitted].

Strickland, 466 U.S. at 681.

At the conclusion of the suppression hearing, the state court distinguished Elrod[5] as the law pertaining to the voluntariness of confessions, and stated that:

> with regard to consent to search, it's the officer's perception that controls. But I'll assume, for the purposes of this discussion, that the Elrod rule is the law as stated; so that the question then becomes the [petitioner's] subjective mental state, whether he actually understood and whether he actually voluntarily decided to consent.
>
> The evidence before me is strong that, yes, he understood and, yes, he voluntarily consented.
>
> . . . [A]ll I know about [petitioner's] condition is that apparently he had a problem with manic depression at the time. When he's off his medications he becomes withdrawn and – sullen, argumentative and all the other symptoms that his sister describes. That has nothing that bears on whether he understood his rights and whether he understood the waiver explanation given him by the officer, Officer Hughes, whether he had the mental capacity to consent. I mean, it's not a question of just sanity versus insanity or mental disorder versus no mental disorder. A person can have a significant mental disorder and still have the cognizant capacity to understand his rights in a situation so as to knowingly and intelligently waive those rights by consent to search, and I have no reason to believe that [petitioner] wasn't able to do all those things.
>
> Officer Hughes' testimony suggested that he appeared to be responding appropriately and to understand. I have no – No basis in the evidence before me to suggest the opposite if that was the case.
>
> I don't know; to me the "no sane man" logic is not very helpful. It doesn't explain much here. And I would suppose that the behavior of denying is somewhat inconsistent with the behavior of

---

[5] United States v. Elrod, 441 F.2d 353 (5th Cir. 1971).

11

> consent. And it may suggest some cognitive impairment on [petitioner's] part, but it doesn't suggest that he didn't understand the explanation and didn't knowingly and intelligently waive his right to . . . consent to the search without a warrant.
>
> As regards the delay and the arraignment, it's very clear to me that there was no purposeful – No improper motivation on the part of Officer Hughes. I don't think it's fair to suggest that he exploited the lengthy pre-arraignment detention. I don't think there was a violation of the letter or of the spirit of Section 825 of the Penal Code under the circumstances. There was no unnecessary or unreasonable delay, given the holidays that occurred.
>
> And even if there was, that would merely mean – If the McNab and Mallory rules control in California, that would merely mean the confession that he gave was inadmissible. It wouldn't necessarily mean that any consent to search he gave was necessarily involuntarily.

(RT 69-71.) The state court also found that the search was within the scope of consent given by petitioner. (RT 71.) The motion to suppress was denied. (Id.)

With regard to petitioner's claim of breach of attorney/client privilege, petitioner states:

> On March 18, 1998 Petitioner was returned to the Sacramento County jail and shortly after, Mr. Butler was contacted by the prosecution and discussed privileged attorney/client information (CSR No. 6489 at 27:10-15).[6]

(2nd Am. Pet. at 9.) The court has reviewed the exhibits appended to petitioner's original complaint and cannot find any page numbered 27 that addresses this alleged conversation. Petitioner has included no other facts or arguments concerning this claim. This claim is conclusory and should be denied on that basis. See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("It is well-settled that '[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'")); Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994) ("we

---

[6] Present attorney could not reconcile the page citation in the original petition.

1   review only issues which are argued specifically and distinctly in a party's opening brief").  Even

2   if this claim had been properly raised, petitioner has failed to demonstrate a constitutional

3   violation.

4              With regard to petitioner's other claims that pretrial counsel was ineffective, on

5   the facts available to pretrial counsel, this court cannot say counsel's failure to more fully

6   investigate a mental defense was deficient performance.  Defense counsel had benefit of

7   petitioner's records from Atascadero State Hospital; petitioner acknowledges that defense

8   counsel sought several continuances to investigate petitioner's psychiatric history.  (2nd Am. Pet.

9   at 6.)  But, as noted by the state court, petitioner has again failed to specifically identify what

10  facts or other evidence defense counsel would have elicited had he taken the additional steps

11  suggested by petitioner.  Petitioner's prior psychiatric history, without more, is insufficient.

12             A review of the transcript of the suppression motion hearing suggests pretrial

13  defense counsel opted to present petitioner's sister as a witness rather than an expert at that time

14  because she knew petitioner longer and better than anyone:

15              And I think what we have here is not a lot of evidence.  Your
                Honor, I don't have an expert before the Court.  I have someone
16              who knows [petitioner] probably better than anyone else I could
                ever find.  And I think her testimony supports, in my position, that
17              no matter what the officer believes, no matter what [petitioner's]
                responses were, the fact of the matter is, those responses and that
18              consent were not voluntary.  And that's based upon the officer's
                observances.
19
                The officer said that he appeared ill, that he had a cold.  That's an
20              observation, but it's also an indication that my client was ill.
                Specifically, mentally ill, lacking the requisite capacity to consent.
21

22  (RT 61.)  Defense counsel stated that he did not have an expert witness "at this time" and argued

23  that the detective "exploited [petitioner's] lack of ability to give consent to search."  (RT 62.)

24  Petitioner's sister testified as to petitioner's history of mental illness and suggested petitioner had

25  been off his medication in December 1995, based on his failure to respond to her numerous

26  efforts to contact him.  (RT 54-56.)

1    Because it appears defense counsel chose to call petitioner's sister rather than an

2  expert witness, this court must defer to that choice as a matter of strategy.  Such a strategic

3  choice was within the range of professionally reasonable judgments, and the decision not to seek

4  more character or psychological evidence than was already in hand was reasonable.  Indeed,

5  some of the records near the date of this hearing reflect petitioner's mental health was improved

6  by the time of the alleged crimes.  On May 26, 1993, petitioner was taking "doxepin 200 mg per

7  day (which has been very effective in his depression)."  (Ex. F to Pet's May 10, 2001 state habeas

8  petition No. O1F03783.)  On January 11, 1994, Staff Psychiatrist Robert C. Behan, M.D. noted

9  that petitioner's psychiatric medication at discharge was doxepin 100 mg at bedtime.  (Ex. C to

10  Pet's May 10, 2001 state habeas petition No. O1F03783.)  Dr. Behan recommended petitioner

11  could be paroled:

12         [Petitioner] has been actively working in his psychiatric treatment,
   has learned to manage his bipolar depressive disorder, and has
13         learned to manage the addictive behavior that leads to his hostility.
   [Petitioner] is ready to return to the community on his earliest
14         possible release date of 02-24-94.

15  (Id. )  Dr. Behan noted petitioner's mental status at the time of his release:

16         [Petitioner] is rational and appropriate of affect, although
   sometimes unrealistically depressed.  He has managed this much
17         better with both medication and with dealing with his suppressed
   hostility, particularly towards his wife, and towards his family in
18         general.  He has not heard voices since March 1992 when he was
   in CMF.  His thought processes are adequately organized.  There is
19         no indication of any gross inability to test reality.  There is no
   longer any indication of psychosis.

20

21  (Id.)  On January 21, 1994, Clinical Psychologist Richard R. Morey, Ph.D., found that although a

22  severe mental disorder was present, petitioner was statutorily excluded from treatment under Cal.

23  Penal Code § 2962[7] as a mentally disordered offender.  (Ex. F to Pet's May 10, 2001 state habeas

24

25      [7]  California Penal Code § 2962 governs the criteria used to require prisoners to be treated
   by the State Department of Mental Health as mentally disordered offenders as a condition of their
26  parole.  (Id.)

petition No. O1F03783.)

On June 9, 1995, Dr. Ofori, a neurologist, noted petitioner's mental status was normal.  (<u>Marsden</u> hearing, RT 39.)

On July 21, 1995, Staff Psychiatrist G.E. Sebastian, M.D., completed a CDC-3010 form, confirming that petitioner was last seen on April 28, 1995, and noting "[Petitioner] attended POC appts regularly.  He was doing well in school.  His mood was stable.  He was developing back problems."  (Ex. C to Pet's May 10, 2001 state habeas petition No. O1F03783.) Petitioner was discharged from parole on March 26, 1995.  (<u>Id.</u>)

These more recent psychiatric records stand in sharp contrast to the records from petitioner's earlier admission to Atascadero State Hospital where he was involuntarily medicated in 1987.  In addition, by petitioner's own admission, he was taking doxepin at the time of his arrest.  (2nd Am. Pet. at 5.)  Petitioner noted that "[i]t was a common finding of evaluators Dr. Sugerman, Dr. Paez, Dr. Alarcon, and Dr. Cosgro [that] when placed on antidepressants experienced increased mood stability and had not had a recurrent episode of severe depression." (2nd Am. Pet. at 7.)

Finally, as noted by the state court judge in denying the motion to suppress, a "person can have a significant mental disorder and still have the cognizant capacity to understand his rights in a situation so as to knowingly and intelligently waive those rights by consent to search."  (RT 71.)  Petitioner has not provided evidence that he lacked the capacity to understand his rights rendering his consent to the search involuntary.

Because petitioner has failed to demonstrate what evidence could or would have been discovered had pretrial defense counsel taken any of the suggested actions, petitioner cannot meet the prejudice prong of <u>Strickland</u>.  That is, petitioner cannot demonstrate that the motion to suppress would have been granted or the state court would have decided not to bind petitioner over for trial at the preliminary hearing.  The state court's finding that petitioner failed to state with particularity the facts upon which the petitioner is relying to justify relief, supported by

1  reasonably available documentary evidence or affidavits was not unreasonable nor contrary to

2  Strickland.  Accordingly, this claim should be denied.

3               ii.  Failure of Trial Counsel (Ground Two)

4        Petitioner contends trial counsel failed to investigate petitioner's psychiatric

5  history, prospective witnesses, present documentary evidence, and defend to negate an element of

6  all offenses charged.  Petitioner concedes that defense counsel Vlautin had benefit of petitioner's

7  records from Atascadero State Hospital.  (2nd Am. Pet. at 10.)  Petitioner contends he

8  "adamantly insisted on presenting a mental and medical defense and asked [counsel] to

9  investigate his psychiatric history," but that counsel "repeatedly refused to investigate petitioner's

10 psychiatric history."  (Id.)  Petitioner acknowledges that defense counsel "repeatedly referred to

11 what the prosecution offered in the examiner's reports of 1997, those that 'suspected' petitioner

12 as being a 'Sophisticated Malingerer.'"  (Id.)

13       It is clear from the record that petitioner and defense counsel had a difference of

14 opinion as to trial strategy in this case.  Defense counsel was adamant about keeping petitioner's

15 mental health records from the jury to avoid the prosecution's focus on reports suggesting

16 petitioner was malingering.

17       On September 23, 1998, petitioner filed a Marsden motion, which was heard on

18 September 29, 1998.  (CT 18.)  During the Marsden hearing, petitioner stated that while he was

19 held in Atascadero for incompetency, it was stated in the report that he was suspected of

20 malingering and that he was not on any psychotropic medication.  (RT at 32 (appended to

21 Answer as Ex. S.)

22              [PETITIONER]: And that my previous stays, all I was taking was
                antidepressants, when I have records to show that prior to my being
23              taken this last time, that I was taking antipsychotics for six months
                prior to my transfer there, which would account for my – my
24              psychosis being in remission.

25              THE COURT: How does . . . Mr. Vlautin have anything to do with
                that?

26

[PETITIONER]: Well, I filed – we filed a motion for a new preliminary hearing based on incompetency, and at the time of the preliminary hearing, and a thorough investigation was not completed.

THE COURT: Who did that investigation?

[PETITIONER]: That's what I'm saying, thorough investigation was done.

THE COURT: You mean by the doctor who wrote the report?

[PETITIONER]: Well, Atascadero wrote their report when I came back, but in that opposition to that report – and the defense for the granting of a motion for new preliminary hearing, the investigation into the alleged . . .

The report that came back, they suspected that there was malingering.  There's nowhere they can actually pinpoint say, yes I was malingering.

THE COURT: You're saying you should have gone back to Atascadero?

[PETITIONER]: No, what I'm saying is that Mr. Vlautin refused to do an appeal on that when I can show that if they would have had this information prior to me going to Atascadero, that the outcome of this evaluation, this report, would have been different.

THE COURT: What would it have said?

[PETITIONER]: I believe it would have said that at that time, that I was not malingering.  And I believe that that would possibly be a greater chance for a new preliminary hearing .  I have records to show that prior to my arrest and at my arrest, that I was a psych referral.

THE COURT: Okay.

[PETITIONER]: All of these facts gathered together would imply that there was an impairment prior to arrest, at arrest and up until I was given the Novane by Dr. Ed Breckner at the jail psych services.  I spoke to him about that, that while I was receiving antidepressants, that antidepressants did not deal with the psychosis part of psychotic features and which I was diagnosed on my release from Atascadero in '94.

I have records to show that prior to me going to Atascadero in '88 that I also was taking Novane and when I got to Atascadero Hospital, that I was taken off because my . . . psychosis was in remission and they [were] dealing with the depression part.  And

that there . . . is a chemical imbalance.  There's a chemical imbalance when I'm taken off of antidepressants.  After a period of time, my depression gets worse[] and then the psychosis comes following that.  Anywhere from three to four months following coming off of the antidepressants.  And here I have a report that talks about the recurrent depression with psych motor retardation impairment in all intellectual faculties and the presence of both visual and auditorial hallucinations as well as delusions.  And this was a discharge summary dated 1/11/94, from Atascadero State Hospital.

And one of the doctors, Dr. Epias, MD., (phonetic) was one of the doctors that was on the panel for the competency when I got returned back to court. . . He was one of those doctors on there.  And he is the same doctor here that is doing this report from '94.

(RT at 32-34.)  When asked what the witnesses would say that petitioner wanted counsel to investigate, petitioner responded that they have information about petitioner's mental state prior to his arrest.  (Id. at 34.)  Petitioner denied wanting to enter a not guilty by reason of insanity plea, stating he had a dual plea in mind "because of the circumstances that led up to my arrest, . . I was not cognizant of what was going on."  (RT at 35.)

Petitioner's defense counsel responded that petitioner suggested he enter a "not guilty by reason of insanity plea or he would call it a dual plea, not guilty and not guilty by reason of insanity, on the grounds that he has an extensive mental history.  Therefore, if he became in possession of stolen property, he was in such a mental state he might not have known it was stolen.  (RT at 38.)

[Mr. VLAUTIN:] After I reviewed all his medical records, I found that to be generally without merit.  Without going in to all of the details specifically, there is one count where [petitioner], for example, is charged with a burglary of a Mr. Avila's house.  I don't know what count that is now, Count One.

He is alleged on the eighth day of June, 1995, first degree burglary of Mr. Mark Avila's house.  [Petitioner] had been in an automobile accident several months before June of 1995.

[Petitioner] also suggested to me that he possibly could not have committed these burglaries because of the fact of a serious back injury that would prevent him from going in windows or crawling in doors, etc.

/////

1      So we have investigated that.  I have his records of his back injury.  He was seen by Dr. Prasad, who referred him to a

2   neurologist, who did an examination of [petitioner] on June 9th, 1995, one day after he's alleged to have committed the burglary in

3   Count One.

4      I have told [petitioner] that not only have we spoken to Dr. Ofori, he says although [petitioner] was experiencing some pain, he

5   walked into the office on his own power.

6   THE COURT: How does that relate to the mental?

7   MR. VLAUTIN: And that he would . . . not have anything that would prevent him from burglarizing a house.

8

9      And as part of his examination of [petitioner], he has a subdivision called Mental Status Examination.

10      Doctor Ofori's report, as I have given [petitioner] statement, "mental status was normal" unquote.

11

12      So his mental status was normal less than 24 hours after he is alleged to have committed the burglary of Mr. Avila's house.  I also have told him that to even suggest a mental defense in this

13   type of case would virtually be laughed out of court.

14      And that it would open the door to the District Attorney alleging malingering because throughout the entire Atascadero report that

15   came back to the Court in March of 1998, it basically says that the [petitioner] appeared to exaggerate symptomology, but never

16   scored in a range that was highly probable for malingering.

17      However, the result of his testing was questionable.  Could not be stated on the basis of psychological testing alone that he was

18   malingering.

19      But then it goes on to proceed to point out the three or four doctors who saw [petitioner] all believe that he was malingering,

20   such as quote, "Very sophisticated malingerer".  There is talk throughout this whole report where [petitioner] alluded to the

21   effect that he may consider an insanity defense, quote, "implying that he would much rather do time in the hospital, than corrections,

22   if it must be served", unquote.

23      Quote from another doctor, quote, "He appears to be a fairly sophisticated malingerer" unquote.

24

25   THE COURT: So those are quotes from the . . . report you received in March of '98 from the doctors?

26   MR. VLAUTIN: Correct, your Honor.

19

1     [Petitioner] says that Atascadero did not know that he had been taking antipsychotic medication. [¶] Well, there on the first page it states that on admission to Atascadero he discussed as suffering from Site Effective Disorder (phonetic) and was placed on antipsychotic medication at the hospital.

     So, basically, I have told [petitioner] that there is no mental defense based on his history.  And there really isn't a mental defense based on the facts of the case.  I have told him that if he was to argue that he was physically unable to commit the crimes that it is not supported by the doctors that we have interviewed.

     This Dr. Ofori . . . the neurologist, has not been subpoenaed by me.  [¶] However, his other referring doctor, Prasad, . . .is a chiropractor.  He told us that [petitioner] was in pain when first consulted, when he first saw him after the accident, needed to be helped in by his girlfriend.  [¶] He gives a little more encouraging response as to [petitioner's] condition by stating that [petitioner] was in great pain and it would be doubtful if he could crawl through windows and things of that nature.  [¶] Although, he states that if [petitioner] wanted to endure the pain, he could.

     . . . .

     [Dr. Prasad] . . . did state that if [petitioner] was using illegal drugs, that could negate any pain.[¶] When [petitioner] was arrested in the stolen automobile, when he gave a statement to the police, he told the police that he had been using illegal drugs for months because of his car accident in order to compensate for the severe pain that he was receiving.  He was using that as an excuse for the two tenths of a gram of cocaine.

     [Petitioner] alluded to the fact that I would not appeal a matter.  What he was referring to, a[n] appeal of a motion.  I filed a motion in this department before Judge Ure to request that [petitioner] receive a new preliminary hearing based on the grounds that there was evidence that he was incompetent at the time of his preliminary hearing when he was represented by Mr. Butler.

     Judge Ure denied the motion on many grounds.  One, that there was a substantial period of time between the preliminary hearing and when [petitioner] was found, picked up in August of 1997.

     As Mr. Butler filed a letter with the Court which in so many words stated that although Mr. Butler had doubts as to [petitioner's] competency during the periods of time he was alleged to have committed these crimes, that he cooperated quite well and he believed he was not incompetent at the time of the preliminary hearing or Mr. Butler said that he would not have proceeded.

     So anyway, Judge Ure denied that motion.  And then [petitioner]

1    filed his own motion to appeal.  Judge Ure said she would not hear
     it.  I told Judge Ure that I had no intentions of filing any appeal or
2    writ in the appellate court because I felt there was no basis for it.

3    (RT at 38-42.)  Mr. Vlautin explained that he informed petitioner counsel didn't need to contact

4    the person petitioner got into an argument with at the car rental agency because counsel already

5    had witnesses lined up who could testify to petitioner's mental state and that counsel didn't "feel

6    a mental defense [was] in [petitioner's] best interest."  (RT at 42-43.)

7         The court denied the <u>Marsden</u> motion stating:

8        I haven't heard anything that would lead me to excuse Mr. Vlautin
         for being ineffective.  Sounds like Judge Ure handled the issue
9        with the second prelim.  I'm not going to relitigate that again.  [¶]
         The issues are, as the doctors report, it seems like there's plenty of
10       witnesses that could refute any kind of insanity plea. . . .[¶] . . .I
         heard enough to assure me that I don't think he's being ineffective
11       when he is advising you on – representing you now.

12   (RT 44.)

13        With respect to petitioner's claim that his trial counsel failed to present evidence

14   of petitioner's alleged mental illness or to present a defense based on inability to form specific

15   intent, it appears that these matters involved a tactical decision as to which defense to choose.

16   Petitioner's allegations in this regard essentially amount to a difference of opinion with respect to

17   trial tactics.  However, a tactical decision by counsel with which the defendant later disagrees is

18   not a basis for a claim of ineffective assistance of counsel.  <u>Guam v. Santos</u>, 741 F.2d 1167, 1169

19   (9th Cir. 1984); <u>United States v. Mayo</u>, 646 F.2d 369, 375 (9th Cir. 1981).  Where it is possible

20   that the failure to present evidence was a "difficult but thoughtful tactical decision," a reviewing

21   court must presume that counsel's conduct was "within the range of competency."  <u>Harris v.</u>

22   <u>Pulley</u>, 885 F.2d 1354, 1368 (9th Cir. 1988).  "Counsel's tactical decisions are 'virtually

23   unchallengeable.'"  <u>Furman v. Wood</u>, 190 F.3d 1002, 1006 (9th Cir. 1999) (citing <u>Strickland</u>, 466

24   U.S. at 687).  In this case, counsel's choice of defense – that petitioner was physically incapable

25   of being a cat burglar and there was no direct physical evidence tying petitioner to the scenes of

26   the burglaries – was reasonable under the circumstances of this case and resulted in a fair verdict.

1    Although petitioner has clearly demonstrated that he has a history of mental illness and drug use,

2    he must show that he was unable to form the actual specific intent at the time of the crime.  His

3    mental state in the years prior to the commission of the crimes is largely irrelevant.  The medical

4    records submitted by petitioner do not shed any light on this question and do not demonstrate that

5    petitioner was unable to form the specific intent to deprive the victims of their property at the

6    time of the offense conduct.

7            To the extent that petitioner is claiming his attorney failed to thoroughly

8    investigate a mental health defense, he has not provided specific facts to support this claim.  See

9    Jones, 66 F.3d at 205.  Petitioner has provided no evidence that petitioner's mental deficiencies

10   were sufficient to support a mental health defense.  Moreover, once counsel reasonably selects a

11   defense, it is not deficient performance to fail to pursue alternative defenses.  Turk v. White, 116

12   F.3d 1264, 1266-67 (9th Cir. 1997).

13           Even if counsel was deficient in his lack of investigation, petitioner has failed to

14   show prejudice.  On this record, petitioner cannot show that had the jury heard evidence of

15   petitioner's history of mental illness, that the outcome would have been different.  Petitioner

16   denied knowing anything about the burglaries, yet stolen property from at least seven victims

17   were found during the search of his property.  Petitioner was arrested driving the stolen vehicle

18   of one of the victims.  Petitioner clearly recalled he was driving to the laundromat to do his

19   laundry at the time of his arrest.  Petitioner had the presence of mind to inform the reception

20   nurse at the Sacramento County Jail that he was taking codeine, soma, doxepin and was abusing

21   crack cocaine.  (2nd Am. Pet. at 5.)   Although petitioner appeared ill during the interview with

22   Detective Hughes, petitioner "had a cold or wasn't feeling quite right" (RT 37), they had a

23   lengthy, two-way, conversation "covering many topics, up to and including his family, his

24   daughter, a drug problem, things of that sort."  (RT 21.)  During that interview, petitioner

25   indicated he understood his Miranda rights as well as the consent to search form.  (RT 18-19;

26   22.)  These facts weighed heavily against the success of a mental defense.

1          Moreover, although petitioner de-emphasizes the psychiatric records alluding to

2   malingering, had those records been admitted before the jury, the prosecution would have argued

3   petitioner was malingering rather than mentally ill.  In his March 11, 1997 opinion concerning

4   whether petitioner was competent to stand trial, Professor Richard M. Yarvis, M.D., M.P.H.,

5   stated he was unable to conclude with certainty whether petitioner was or was not competent to

6   stand trial:

7               A full mental status exam could not be performed in this case
                given [petitioner's] drift in attention span and unresponsiveness to
8               questions asked.  However, if [petitioner] can be believed, he was
                delusional, hallucinating, confused and disoriented.
9
                [Petitioner's] behavior during the interview was exceedingly
10              inconsistent.  At times he appeared to be quite functional and at
                other times so dysfunctional as to be persistently and profoundly
11              impaired.  In this regard, it should be noted that [petitioner] is not
                currently housed on the psychiatric unit in the jail but rather on a
12              medical unit given his need for a walker for an alleged back injury.

13              It should also be noted that [petitioner's] mental state waxes and
                wanes from day to day according to his attorney.  The profound
14              differences from day to day are unusual in my experience and
                suspicious.  This suggests to the examiner the possibility that
15              [petitioner] is either malingering and/or grossly exaggerating his
                level of impairment.  To determine [petitioner's] true state of
16              impairment, a prolonged period of observation in a facility skilled
                in assessing competency will be required.

17

18  (Appended to Pet.'s Original Complaint, filed April 17, 2002, at 2.)  Dr. Yarvis recommended

19  that petitioner be referred to Atascadero State Hospital's competency unit for evaluation because

20  it would be unlikely petitioner could "successfully malinger the observed level of impairment"

21  during a 30-day observational period.  (Id.)  The court declared petitioner to be incompetent to

22  stand trial on July 14, 1997 and on August 7, 1997, petitioner was committed to Atascadero.  Dr.

23  R. Wunderlich, M.D., conducted petitioner's medical and physical status upon admission, listed

24  petitioner's diagnosis on November 19, 1997 admission as "Schizoaffective disorder, depressed

25  type, polysubstance abuse in institutional remission, and antisocial personality disorder

26  (provisional) and hypertension."  (Traverse at 8.)  In Dr. Wunderlich's March 5, 1998 report, he

also wrote "Several examiners have suspected malingering." (Traverse at 8.) The final report from Atascadero, provided the state court in March of 1998,[8] concluded that petitioner appeared to exaggerate symptomology, but did not score in a range that was highly probable for malingering. (Marsden Hearing, RT 39-40.) However, three or four doctors who saw petitioner believed he was malingering, and one called petitioner a "[v]ery sophisticated malingerer." (Id. at 40.) The report noted petitioner alluded to the effect that he may consider an insanity defense, "implying that he would much rather do time in the hospital, than corrections, if it must be served." (Id.)[9] Petitioner was found competent to stand trial and criminal charges were reinstated on March 20, 1998.

Petitioner has not demonstrated how any of these records would have negated the element of specific intent. Petitioner has not provided a psychiatric report refuting Dr. Yarvis' observations or those observations contained in the March 1998 final report from Atascadero or a report finding he was unable to form specific intent at the time of the offenses at issue herein. The fact that so many mental health professionals alluded to malingering supports an inference that the jury would disregard a defense claiming petitioner could not form the specific intent based on mental illness.

Finally, there is some evidence in the record that petitioner's health may have decompensated during the pendency of the criminal action rather than during the period of the 1995 crime spree. On June 12, 1998, the assigned prosecutor filed a declaration stating that during the time petitioner was represented by defense counsel Butler, counsel did not express any concerns to the prosecution about the petitioner's mental competence. (CT 124.) The prosecutor declared that:

---

[8] The March 1998 report is not contained within the Clerk's Transcript and does not appear to have been provided by either party. However, given the lengthy references to the report in the first Marsden hearing, the actual copy of the report is not required.

[9] Petitioner, however, denies he ever said he would rather do time in a hospital rather than corrections. (Traverse at 9.)

1
2   During court appearances prior to and around the time of the
    Motion to Suppress and the Preliminary Hearing the [petitioner]
3   appeared to be aware of what was taking place although at times
    the [petitioner] would not answer the court when he was addressed
    directly.

4   (CT 124.)  At the time of the preliminary hearing, petitioner

5   walked with only a cane because of injuries suffered in a car
    accident.  Subsequent to that time, [petitioner] began to use a
6   walker, and at an even later time, he began to appear in court using
    a wheelchair.
7
    [Petitioner] began to demonstrate outward manifestations of mental
8   incompetence around the period of time that attorney Tommy
    Clinkenbeard substituted back into the case.
9

10  (CT 124.)  The court has reviewed the record in conjunction with petitioner's laundry list of

11  actions petitioner believes defense counsel should have taken on his behalf.  This court cannot

12  find that but for defense counsel's failure to take those actions the outcome of this case would

13  have been any different.  For example, even if defense counsel had cross-examined Detective

14  Hughes to point out that the charm bracelet had been pawned on September 26, 1995 rather than

15  September 16, 1995, or had managed to adduce evidence from Ms. Bennett that she had written a

16  check payable to a "Richard" for petitioner's payment for a piece of jewelry, the outcome of this

17  case would not have been different because of the large number of stolen items found in

18  petitioner's possession.  Petitioner therefore fails to meet the prejudice prong of Strickland.

19          For all of the above reasons, the state court's rejection of this claim for relief was

20  neither contrary to, nor an unreasonable application of, controlling principles of United States

21  Supreme Court precedent.  This claim should also be denied.

22          iii.  Due Process and Sixth Amendment Violations

23  In ground three, petitioner articulates his claim as follows:

24  Ineffective assistance of counsel involving due process and Sixth
    Amendment violations based on Petitioner's "consent to search"
25  waiver and "officer's perception v. evidence of impairment of all
    Petitioner's intellectual faculties.
26

1
2
3
4

> Petitioner bases this challenge on the failure of his pre-trial attorney to have him examined by a psychologist or psychiatrist immediately to discover Petitioner's incompetence at the start of the case; omission of documentary evidence, expert testimony; prospective witness; and need to answer federal questions of national importance.

5   (2nd Am. Pet. at 13.)  Petitioner recounts his psychiatric history from 1987 through 1995.  (2nd

6   Am. Pet. at 13-14.)

7           Petitioner faults counsel for "inadvertently omitting another interview with Dr.

8   Prasad with Ms. Boyd . . . attesting to Petitioner's mental status in August of 95."  (2nd Am. Pet.

9   at 14.)  Petitioner ends this claim by stating:

10
11
12
13

> Had the attorney conducted an investigation into these records, and conducted interviews, including Enterprise Car Rental on Arden Way which never was investigated.  Had these been submitted at the suppression hearing, or even at trial for that matter, the results of the proceeding would have been different.  The "consent to search" did not specify the items to be seized nor was Petitioner given a receipt for the items seized, even to this date.

14   (2nd Am. Pet. at 14-15.)  In his traverse, petitioner contends that additional inquiries and

15   investigation probably would have established petitioner was not mentally competent to consent

16   to a search.  (Traverse at 12.)

17           Much of this claim was resolved in ground one above.  Petitioner's mental health

18   history, without more, is insufficient to demonstrate petitioner did not voluntarily consent to the

19   search of his property.  Petitioner did not provide a copy of Dr. Prasad's 1995 report.  Trial

20   counsel referred to this report during the <u>Marsden</u> hearing, noting that Dr. Prasad is a

21   chiropractor who referred petitioner to a neurologist.  (RT 39.)  Dr. Prasad's report would have

22   been trumped by Dr. Ofori, a neurologist, who found petitioner's mental status was normal.  (RT

23   39.)  Petitioner has not provided a declaration by the person with whom he allegedly got into an

24   argument with at the car rental agency.  But even if he had, petitioner has not demonstrated how

25   such a declaration would have changed the outcome of the suppression motion or at trial.

26   /////

1    To the extent that petitioner contends defense counsel failed to gather additional

2    evidence to challenge the denial of the motion to suppress, petitioner's claim fails as a matter of

3    law.

4    The standard for measuring the scope of a suspect's consent under
     the Fourth Amendment is that of "objective" reasonableness-what

5    would the typical reasonable person have understood by the
     exchange between the officer and the suspect? Illinois v.

6    Rodriguez, supra, at 183-189, 110 S.Ct., at 2798-2802; Florida v.
     Royer, 460 U.S. 491, 501-502, 103 S.Ct. 1319, 1326-1327, 75

7    L.Ed.2d 229 (1983) (opinion of WHITE, J.); id., at 514, 103 S.Ct.,
     at 1332 (BLACKMUN, J., dissenting).

8

9    Florida v. Jimeno, 500 U.S. 248, 251 (1991).  As applied to this case, the court would determine

10   whether Detective Hughes' consideration of petitioner's consent to search his property was

11   reasonable.  Had the state court applied this standard rather than the standard of Elrod, the court

12   would have found it was reasonable based on Detective Hughes' testimony.  (RT 16-68.)  Thus,

13   defense counsel was not ineffective for failing to further pursue suppression of the evidence.

14   Petitioner has failed to provide evidence establishing that there is a reasonable

15   probability that, but for counsel's errors, the result of the proceeding would have been different.

16   Even if petitioner's prior mental health records had been admitted, the prosecution would have

17   moved to have the rest of petitioner's mental health records admitted.  It is more likely that the

18   jury would have found the most recent Atascadero report compelling, rather than the earlier

19   records, as it was closer in time to the crime spree and reflected the opinions of three or four

20   different doctors.  The fact that all of these doctors expressed concerns that petitioner might be

21   malingering and that petitioner was vying for a stay at Atascadero rather than state prison was

22   damaging evidence that a reasonable attorney would want to keep from the jury.  That damaging

23   evidence was sufficient to color whatever evidence of mental illness there was to support

24   petitioner's claim that his mental illness prevented petitioner from actually forming the specific

25   intent to deprive the victims of their property.  Accordingly, this claim should also be denied.

26   /////

1    C.  <u>Fourth Claim</u>

2         In his fourth claim, petitioner claims ineffective assistance of appellate counsel.

3         The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

4    v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

5    However, an indigent defendant "does not have a constitutional right to compel appointed

6    counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

7    professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751

8    (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the

9    ability of counsel to present the client's case in accord with counsel's professional evaluation

10   would be "seriously undermined."  Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

11   Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

12   not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

13   meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

14   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

15   to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

16   context, petitioner must demonstrate that, but for counsel's errors, he probably would have

17   prevailed on appeal.  Miller, 882 F.2d at 1434, n.9.

18        Petitioner again raises a laundry list of actions he believes appellate counsel

19   should have taken.  However, petitioner cannot demonstrate ineffective assistance of appellate

20   counsel on the basis of failure to investigate petitioner's mental health history or take other

21   actions for the same reasons set forth above.

22        A review of the record reflects petitioner's appellate counsel apparently reviewed

23   the trial transcripts and raised the issues he believed had the most merit.  This decision was

24   "within the range of competence demanded of attorneys in criminal cases."  McMann v.

25   Richardson, 397 U.S. 759, 771 (1970).  Although petitioner faults counsel for not raising the

26   claims contained in this petition, this court has evaluated those claims and determined they lack

1    merit.  Accordingly, petitioner is unable to demonstrate prejudice.  After a review of the record,

2    this court concludes that the state court determination with regard to petitioner's claim of

3    ineffective assistance of appellate counsel was not contrary to, or an unreasonable application of

4    Strickland.   Accordingly, petitioner is not entitled to relief on this claim.

5          D.  Fifth Claim

6                Petitioner's fifth claim is that there was insufficient evidence to sustain the

7    burglary convictions.

8                The state court rejected this claim on direct appeal as follows:

9                   To establish a first-degree burglary, the prosecution must prove
             beyond a reasonable doubt that [petitioner] entered an inhabited
10           dwelling house, with the specific intent to commit a theft or felony
             therein.  (Pen. Code, § 459; *People v. Poggi* (1988) 45 Cal.3d 306,
11           325.)  There is no dispute that the crimes committed here were
             burglaries; that is, that *someone* entered inhabited dwelling houses
12           with the specific intent to commit a theft therein.  The dispute
             arises as to whether [petitioner] was that someone.
13
                   It is also undisputed that [petitioner] possessed the recently stolen
14           property of Avilla, Shorey and her sister, Sanford, Williams,
             MacNamee and Gallant.  Specifically, the items found in
15           [petitioner's] trailer and shed included Avilla's cashbox and purse,
             Shorey's purse and wallet, Shorey's sister's purse, Sanford's purse
16           and wallet, and MacNamee's purse.  Within some of these purses
             were identification cards, personal effects, a dental reminder card
17           and a family photo.

18                 There may be cases in which the very nature of the goods
             possessed supplies the necessary corroboration.  (*People v.
19           Dickerson* (1969) 273 Cal.App.3d 645, 648.)  This is such a case.
             Seven burglaries were committed over the course of six months
20           throughout the Sacramento area.  There is no intrinsic value in used
             purses, wallets, a cashbox, a family photograph, a dental reminder
21           card, a work identification badge, a Supercuts card, an insurance
             card or identification cards.  These items were useless to
22           [petitioner].[10]

23                 Where several "burglaries are committed and the defendant is

24    _____

         [10]  To the extent that [petitioner] offered an explanation of his possession of some of the
25    items, it was essential that he was a collector of various and sundry items and frequented flea
      markets and auctions.  There was not, however, any suggestion that [petitioner] collected purses,
26    cashboxes or wallets.

shown to be in possession of items, useless to him, but stolen during each of the several burglaries, the inference that he is, in fact, the burglar becomes a very strong one indeed.  The repetition of an otherwise senseless possession, coupled with our knowledge that someone had stolen the goods from their owners, reduces the likelihood that the person is someone other than the defendant to the vanishing point." (*Dickerson, supra,* at pp. 648-649.) Accordingly, [petitioner's] possession of an empty cashbox, six ladies' purses, three victim's wallets, along with their photographs and various personal effects is corroborating evidence from which a jury could conclude that [petitioner] committed these burglaries.

In addition, contrary to [petitioner's] contention, these burglaries were unique.  They were "cat burglaries."  Detective Hughes testified that such burglaries are very rare.  In each of the seven burglaries, including the one not challenged on appeal by [petitioner], the victim lived in a condominium or apartment-type home, the burglar entered through either a kitchen window or a sliding glass door, at night while the victim was at home, and the property taken was small and easily portable, such as purses, wallets, jewelry and jewelry boxes.  And, *each* of these victim's property was found in [petitioner's] possession.  It is beyond the bounds of credulity to suggest that [petitioner] just happened to repeatedly purchase at flea markets and auctions property stolen from homes in an almost identical manner.

Viewing this evidence as a whole, [the court] cannot say that there is no rational connection between these facts and the inference of guilt.  (See *Johnson, supra,* 6 Cal.4th at pp. 37-38.) Similarly, [the court] cannot conclude that no rational trier of fact could have found guilt based on the evidence and the inferences reasonably drawn therefrom.  Accordingly, [the court] must affirm the seven burglary convictions.

(People v. Simmons. slip op. at 8-10.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond

a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson,

443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when

challenging the sufficiency of the evidence used to obtain a state conviction on federal due

process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).

   The court must review the entire record when the sufficiency of the evidence is

challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  If the trier of

fact could draw conflicting inferences from the evidence, the court in its review will assign the

inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The

relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th

Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a

reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors

reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court

determines sufficiency of the evidence in reference to the substantive elements of the criminal

offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

   The evidence adduced at trial is recounted above.  Petitioner's possession of

multiple items stolen from seven different victims[11] at night was sufficient to warrant the

inference of guilt.  There are no conflicting inferences that could be drawn from this evidence.  A

rational jury could reasonably infer that petitioner committed the burglaries based on his

possession of the purses, wallets, cashbox and check.  Petitioner was arrested while driving a car

---

[11]  Although petitioner was charged and convicted of seven burglaries, the property of eight different victims was discovered in his home:  Avilla, Shorey and her sister, Sanford, Williams, MacNamee, Gallant and Young.

1  stolen from one of the burglary victims and some of her stolen property was found during the

2  search of petitioner's property.  This was sufficient under California law to meet the substantive

3  elements of first degree burglary.  The jury was properly instructed on conscious possession and

4  corroboration.  (RT 522-23.)

5          The state court's rejection of petitioner's fifth claim for relief was neither contrary

6  to, nor an unreasonable application of, controlling principles of United States Supreme Court

7  precedent.  Petitioner's fifth claim for relief should be denied.

8          E.  Sixth Claim

9          Petitioner's sixth claim is that he was denied a fair trial and a unanimous jury

10  verdict because the trial court used CALJIC No. 17.41.1.[12]  (2nd Am. Pet. at 18.)

11          There is no reasoned state court opinion addressing this claim.  However, in

12  Brewer v. Hall, 378 F.3d 952, 956 (9th Cir. 2004), the United States Court of Appeals for the

13  Ninth Circuit held that there is no decision of the United States Supreme Court establishing "that

14  an instruction such as CALJIC 17.41.1 violates an existing constitutional right."  Thus,

15  petitioner's claim is foreclosed by the decision in Brewer.

16          Even if the state trial court erred in instructing the jury with CALJIC No. 17.41.1,

17  any such error was harmless under the circumstances of this case.  See Brecht v. Abrahamson,

18  507 U.S. 619, 623 (1993) (holding that a federal court may not grant habeas relief for trial errors

19  without a showing of actual prejudice, defined as a "substantial and injurious effect or influence

20  in determining the jury's verdict").  There is no evidence that any of the jurors at petitioner's trial

21  wished to engage in jury nullification or that any juror was a "holdout" for acquittal.  There is

22  simply no indication that the giving of CALJIC No. 17.41.1 in this case chilled the jurors'

23

---

24          [12] "The integrity of a trial requires that jurors, at all times during their deliberations,
    conduct themselves as required by these instructions.  Accordingly, should it occur that any juror
25  refuses to deliberate or expresses an intention to disregard the law or to decide the case based on
    penalty or punishment, or any other improper basis, it is the obligation of other jurors to
26  immediately advise the court of the situation.

1  exercise of free speech or prevented free and full deliberations on the part of the jury.

2  Accordingly, petitioner is not entitled to relief on this claim.

3        For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's

4  application for a writ of habeas corpus be denied.

5        These findings and recommendations are submitted to the United States District

6  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

7  days after being served with these findings and recommendations, any party may file written

8  objections with the court and serve a copy on all parties.  Such a document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

10  failure to file objections within the specified time may waive the right to appeal the District

11  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12  DATED:  November 5, 2007.

UNITED STATES MAGISTRATE JUDGE

001;simm0794.157